IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ANDRE LIPFORD and SOPHIEA LIPFORD, *on behalf of themselves and all similarly situated consumers*,<br><br>　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>SPECIALIZED LOAN SERVICING, LLC,<br><br>　　　　　　　　　　Defendant. | Civil Action No. 1:23-cv-1198 |

## CLASS ACTION COMPLAINT

Plaintiffs Andre Lipford and Sophiea Lipford, on behalf of themselves and all similarly situated consumers, file this Complaint against Defendant Specialized Loan Servicing, LLC ("SLS") and allege as follows:

## PRELIMINARY STATEMENT

1. Mr. and Mrs. Lipford purchased their home in Alexandria, Virginia in December 2006 using the predatory 80/20 mortgage loan scheme.

2. Despite being victims of this predatory lending practice, the Lipfords were able to save their homes during the 2007-08 mortgage crisis by modifying their first mortgage through the HAMP program.

3. After the Lipfords obtained a HAMP modification, they believed that their second mortgage was resolved as part of the modification. This belief was supported by the fact that they stopped receiving monthly mortgage statements about their second mortgage after their HAMP modification.

4. The Lipfords have not made any payments towards their second mortgage since 2009.

5. Their second mortgage was eventually assigned to SLS for servicing.

6. At the time that SLS received the servicing rights to the Lipfords' second mortgage, the mortgage had been charged off, and no one was sending them monthly mortgage statements.

7. SLS did not start sending the Lipfords monthly mortgage statements when it acquired servicing rights to their loans.

8. After more than a decade of hearing nothing about their second mortgage, SLS is now threatening foreclosure of the Lipford's homes through their second mortgage.

9. SLS, however, is seeking to collect a vastly inflated amount that the Lipfords do not owe.

10. For example, the original balance of Mr. And Mrs. Lipford's second mortgage was $107,000. And even though they haven't received any monthly statements since 2009, SLS claims that they owe approximately $260,000.

11. As explained below, these interest charges were not permissible unless SLS was sending monthly statements.

12. Because SLS's charging of interest during times in which consumers were not sent monthly statements appears to be SLS's standard policy and practice, Mr. and Mrs. Lipford allege a class claim against SLS for making false and misleading representations about the amount of their second mortgage in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e.

13. Mr. and Mrs. Lipford also allege individual claims against SLS for SLS's improper servicing of their loan, including claims under the FDCPA, § 1692f, for attempting to collect

amounts not authorized by law and threatening foreclosure of their home when there was no present right to possession of the property, and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e)(2), for failing to properly respond to their Qualified Written Request.

## JURISDICTION AND VENUE

14. This Court has federal question jurisdiction under 28 U.S.C. § 1331, 12 U.S.C. § 2605(f), and 15 U.S.C. § 1692k.

15. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District and Division.

## PARTIES

16. Mr. and Mrs. Lipford are natural persons who live in Alexandria, Virginia. They are consumers as defined by 15 U.S.C. § 1692a(3).

17. SLS is a foreign limited liability company with its principal place of business in Highlands Ranch, Colorado. SLS is a mortgage loan servicing company governed by RESPA.

18. SLS is also a debt collector under the FDCPA because it treated her loan as in default at the time it acquired the loan's servicing rights. *See Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 362 (6th Cir. 2012); *Schlosser v. Fairbanks Cap. Corp.*, 323 F.3d 534, 537–38 (7th Cir. 2003).

## FACTS

### *Zombie Second Mortgages*

19. This case arises from the recent wave of attempts to collect "zombie" second mortgages—largely, subprime second mortgages originated before the 2007–08 mortgage crisis.

3

20. Prior to the mortgage crisis, second mortgages were often used in "80/20" mortgage schemes, which allowed underqualified borrowers to finance home purchases through two mortgages—without a down payment and without having to pay for mortgage insurance.

21. But second mortgages severely harmed consumers because of high interest rates and large balloon payments due at the end of the loan.

22. Consequently, during the Great Recession, many borrowers in 80/20 mortgage schemes were required to modify their first mortgages to remain in their homes, while their second mortgages were charged off or significantly reduced or forgiven as part of the HAMP Second Lien Modification Program ("2MP Program"). *See* https://www.hud.gov/sites/documents/MAY2014MHAREPORTFINAL.PDF ("Provides modifications and extinguishments on second liens when there has been an eligible first lien modification on the same property) (last visited Aug. 17, 2023).

23. Once charged off or extinguished, consumers no longer received statements or heard anything about their second mortgages, sometimes for more than a decade, like each of the Plaintiffs.

24. Because charge-offs or cancellations typically happened around the time that consumers modified their first mortgages, many believed that the modification of their first mortgage also resolved their second mortgage—a belief that was perpetuated by the fact that consumers no longer received statements relating to their second mortgages.

25. Unbeknownst to many consumers, however, their second mortgages did not go away.

26. Instead, they were sold—often several times—to various debt buyers and subprime lenders.

27. Now, with the recent surge in housing prices, consumers have significant equity in their homes that make charged-off second mortgages highly profitable.

28. Debt buyers are now seeking to collect on defaulted second mortgages and, if consumers cannot pay, debt buyers are foreclosing on homes, selling the property, and taking the (often significant) equity to pay the outstanding loan—which they likely bought for pennies on the dollar.

29. This highly profitable scheme has surged in recent months, as home prices have increased and COVID foreclosure moratoriums have expired.

30. The debt buyer involved—like SLS—is using the foreclosure process to collect money that it is not entitled to, essentially stealing equity from consumers who survived the initial housing crisis of any remaining equity that they have since earned in their homes.

31. Even worse, debt collectors are not collecting the amount due on the mortgages when they are charged off, as the law requires.

32. Under Truth-in-Lending-Act regulations, once a mortgage is charged off, the servicer is no longer required to send monthly statements, but it cannot assess any additional late fees or interest on the account. 12 C.F.R. § 1026.41(e)(6)(i).

33. Instead, the servicer may resume charging interest and fees on the account only if it resumes sending monthly statements, but it may not retroactively assess any fees or interest for the time during which statements were not sent. 12 C.F.R. § 1026.41(e)(6)(ii).

34. Yet services are retroactively assessing late fees and adding interest to the loans—amounts that were waived by the prior loan servicers—and are seeking to collect vastly inflated amounts from consumers.

35. In Mr. and Mrs. Lipford's case, for example, their loan balance more than doubled because of improper fees and charges.

36. When debt collectors, like SLS, can foreclose on properties and collect these improper charges, it not only robs the consumers of their homes, but it also strips them of tens of thousands of dollars in equity—one of the primary ways that low-income and middle-class families can build wealth.

### *Mr. and Mrs. Lipford's Zombie Second Mortgage*

37. Mr. and Mrs. Lipford purchased their home in Alexandria, Virginia in December 2006.

38. As was common at that time, Mr. and Mrs. Lipford financed their house using two mortgages.[1]

39. A few years after purchasing their home, the Lipfords suffered financial difficulties and began the process of applying for a loan modification on the first mortgage.

40. Mr. and Mrs. Lipford's first mortgage was permanently modified under the HAMP program in effect at that time.

41. At that time, Mr. and Mrs. Lipford stopped receiving monthly mortgage statements for their second mortgage.

42. Mr. and Mrs. Lipford believed that the lack of statements was because after the HAMP modification of their second mortgage, their second mortgage was resolved by President Obama's 2MP programs in effect at the time that cancelled their second mortgage.

---

[1] https://www.consumerfinance.gov/ask-cfpb/what-is-a-piggyback-second-mortgage-en-1955/ (last visited Aug. 18, 2023).

43. Mr. and Mrs. Lipford did not hear anything about their second mortgage for nearly 15 years.

44. Then, in April 2023, they learned that SLS had referred their home to foreclosure when they received a foreclosure notice stating that their home would be sold at a public auction on June 16, 2023.

45. This foreclosure notice, which SLS directed that its agent send to the Lipfords, stated that the Lipfords owed $259,836.82 on their second mortgage.

46. This statement was false because it included interest that had been assessed to their loan during a time in which they were not receiving monthly statements.

47. The Lipfords did not understand how their home had been referred to foreclosure, let alone why the balance was so high.

48. To try and get additional information about their second mortgage—which they believed was resolved in 2009—the Lipfords sent SLS a QWR in May 2023.

49. This letter contained all the necessary information to be considered a Qualified Written Request, including the Lipfords' personal information and the loan information, and was sent to the address that SLS has designated for Qualified Written Requests.

50. The Lipfords' Qualified Written Request disputed the amount of interest that SLS had assessed to the loan, explaining that they believed the interest charges were improper because they had not received monthly statements.

51. The Lipfords' Qualified Written Request also asked SLS to send them documents to support their dispute including: (1) the servicing notes for their loan; (2) the identity of the owner of the loan; (3) any notices that were mailed to the Lipfords since November 2009; (4) any

documents supporting the foreclosure referral; and (5) a breakdown of all fees charged to the loan and any supporting invoices.

52. SLS responded to the Lipfords' Qualified Written Request on July 11, 2023.

53. SLS's response was deficient in several respects.

54. For example, SLS acknowledged that it was not permitted to assess interest for the months that it did not send the Lipfords monthly statements but did not remove all the improper interest charges. Instead, it only removed interest charges between January 2022 and May 2023.

55. This response was not correct because the Lipfords did not receive statements before January 2022.

56. In fact, the documents attached to SLS's QWR response shows that SLS sent at least one of the Lipfords' monthly statements not to the Lipfords, but to the foreclosure law firm SLS had hired to foreclose on the Lipfords' home.

57. SLS also refused to provide many of the documents that the Lipfords requested, including the servicing notes.

58. Because of SLS's conduct, the Lipdords have suffered actual damages, including significant emotional distress caused by the fear of losing a home where they have lived for almost 18 years, and informational injury.

<u>**COUNT ONE**</u>**:**
**VIOLATION OF FDCPA, 15 U.S.C. § 1692e(10)**
**(Class Claim)**

59. Mr. and Mrs. Lipford incorporate the preceding allegations.

60. Under Federal Rule of Civil Procedure 23, Mr. and Mrs. Lipford bring this action for themselves and on behalf of the following class:

> All consumers: (1) with a loan that was in default at the time SLS became the servicer of the loan; (2) to whom SLS sent correspondence in the one year predating the filing of this lawsuit; (3) seeking to collect late fees, default-related fees or

interest assessed by SLS for time periods when the consumer did not receive monthly statements.

61. **Numerosity**. Fed. R. Civ. P 23(a)(1). Upon information and belief, Mr. and Mrs. Lipford allege that the class members are so numerous that joinder of all is impractical. Upon information and belief, SLS services thousands of non-performing loans and subjects all of them to the same procedures for the assessment of interest, default charges and late fees. The class members' names and addresses are identifiable through SLS's internal business records, and they may be notified of this litigation by published or mailed notice.

62. **Predominance of Common Questions of Law and Fact**. Fed. R. Civ. P. 23(a)(2). Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether SLS is a debt collector; (2) whether SLS violated § 1692e of the FDCPA by making false representations about Mr. and Mrs. Lipford's and putative class members' debts; and (3) the appropriate amount of statutory damages.

63. **Typicality**. Fed. R. Civ. P. 23(a)(3). Mr. and Mrs. Lipford's claims are typical of the claims of each putative class member. They are also entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

64. **Adequacy of Representation**. Fed. R. Civ. P. 23(a)(4). Mr. and Mrs. Lipford are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the class members that they seek to represent. Mr. and Mrs. Lipford have retained counsel competent and experienced in class-action litigation, and they intend to continue to prosecute the action vigorously. Mr. and Mrs. Lipford and their counsel will fairly and

adequately protect the putative class members' interests. Neither Mr. and Mrs. Lipford nor their counsel have any interests that might cause them to not vigorously pursue this action.

65. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the courts. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by SLS's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

66. SLS violated § 1692e(10) of the FDCPA by using false representations to collect or attempt to collect debts from Mr. and Mrs. Lipford and the putative class members.

67. For example, SLS falsely represented that Mr. and Mrs. Lipford and the putative class members owed late fees and interest for the months that they were not sent monthly statements.

68. SLS's statements were false. Mr. and Mrs. Lipford and the putative class members did not owe these late fees or interest because they were not sent monthly statements.

69. Mr. and Mrs. Lipford and each putative class member suffered a concrete injury in fact because of SLS's misrepresentation including, for example, an adverse impact on debt-making decisions and emotional distress.

70. In addition, some class members suffered actual damages when they paid these improper fees to SLS.

71. Under 15 U.S.C. § 1692k, Mr. and Mrs. Lipford seek actual and statutory damages for themselves and each putative class member and their reasonable attorneys' fees and costs. They also seek actual damages for the class members in the amount of the improper fees that they paid to SLS.

## COUNT TWO:
### Violation of FDCPA, 15 U.S.C. § 1692f
### (Individual Claim Against SLS)

72. Mr. and Mrs. Lipford incorporate the preceding allegations.

73. SLS's conduct towards Mr. and Mrs. Lipford violated several provisions of 15 U.S.C. § 1692f.

74. First, SLS violated 15 U.S.C. § 1692f(1) when it attempted to collect interest during the months that the Lipfords did not receive monthly statements, which was not permitted by law.

75. Second, SLS violated 15 U.S.C. § 1692f(6) attempting to foreclose on Mr. and Mrs. Lipford's property. SLS did not have any present right to possession of the property at the time that it scheduled the foreclosure sale because neither SLS nor its agents ever sent the Lipfords a notice that complied with Va. Code § 55.1-321.

76. For example, the notice that SLS's agents sent to the Lipfords did not comply with Virginia law because it listed an inaccurate outstanding balance.

77. Because of SLS's violations of 15 U.S.C. § 1692f, Mr. and Mrs. Lipford suffered actual damages, including significant emotional distress.

78. Based on SLS's violation of § 1692f, Mr. and Mrs. Lipford are entitled to actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1692k.

**COUNT THREE:**
**Violation of RESPA, 12 U.S.C. § 2605(e)(2)**
**(Individual Claim Against SLS)**

79. Mr. and Mrs. Lipford incorporate the preceding allegations.

80. As alleged above, Mr. and Mrs. Lipford submitted a qualified written request to SLS, and SLS received the request.

81. SLS violated 12 U.S.C. § 2605(e)(2) by failing to make appropriate corrections to the Lipfords' account, including removal of the improper interest from their account.

82. SLS also violated 12 U.S.C. § 2605(e)(2) by failing to provide the Lipfords with most of the information they requested or to explain why the requested information was unavailable.

83. Because of SLS's conduct, the Lipfords suffered concrete and particularized harm, including: assessment of fees and charges that they did not owe, and emotional distress, including aggravation and stress.

84. Upon information and belief, discovery will reveal that SLS's noncompliance with 12 U.S.C. § 2605(e)(2) is a part of a pattern or practice of noncompliance with 12 U.S.C. § 2605(e).

85. SLS has also been sued multiple times for failing to properly respond to Qualified Written Requests, including by failing to conduct proper investigations or provide information.

86. In addition, the Consumer Financial Protection Bureau's consumer complaint portal shows that 7,464 mortgage-related complaints have been filed against SLS as of August 23, 2023, including 134 complaints for failing to investigate an existing problem.

87. Mr. and Mrs. Lipford are entitled to recover actual damages, statutory damages, costs, and attorney's fees from SLS for each of its violations of 12 U.S.C.§ 2605(e)(2) under 12 U.S.C. § 2605(f).

## PRAYER FOR RELIEF

WHEREFORE, Mr. and Mrs. Lipford, on behalf of themselves and the putative class members, move for class certification and for statutory and actual damages, as well as their attorneys' fees and costs as pleaded above against SLS for the class claim, as well as actual and statutory damages, injunctive relief, and attorneys' fees and costs for their individual claims; for pre-judgment and post-judgment interest at the legal rate, and any other relief the Court finds appropriate.

**PLAINTIFFS DEMAND A JURY TRIAL.**

Respectfully submitted,
**PLAINTIFFS**

By: _/s/ Kristi C. Kelly_
Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
J. Patrick McNichol, VSB #92699
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com
*Counsel for Plaintiffs*